THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NEIL BLITSTEIN, Defendant-Appellant.

First District (6th Division) No. 1—88—0953

Opinion filed December 15, 1989.

John Thomas Moran, Jr., of Law Offices of John Thomas Moran, and
Mitchell C. Ex, of Kessler & Ex, both of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Bonnie
Meyer Sloan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Neil Blitstein, was convicted of theft by deception following a trial without a jury. The trial court sentenced defendant to two years' probation. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt and that the three-year statute of limitations had run when the State filed its indictment. Al-

though we find that the statute of limitation issue is dispositive of the appeal, we shall set forth the facts in some detail.

On March 21, 1986, defendant was indicted by a grand jury for the continuing theft of checks belonging to Scrap Corporation of America (SCA). The indictment alleged that defendant "obtained by deception control over property, to wit: checks or orders for the payment of money of an amount in excess of $300 *** intending to permanently deprive the owner of the use and benefit of said property." The indictment stated further that the offense was "one of a series of such offenses performed at different times *** and for which period of limitations prescribed by chapter 38, section 3—8, begins at the time when the last such act is committed, to wit: on or about March 22, 1983."

On May 2, 1986, defendant requested a bill of particulars. The State answered that it had tendered the 91 checks which created the $101,000 figure charged in the indictment. The court found this was sufficient answer to defendant's request.

On September 30, 1986, defendant filed a motion to dismiss based on the statute of limitations. Defendant argued that the last "overt act" of the continuing theft was March 16, 1983, the date of the last alleged nondelivery of goods, or on March 18, 1983, the date of the check issued by SCA to defendant's company. The State maintained that the last overt act occurred on March 30, 1983. The court denied the motion to dismiss, relying on the fact that defendant's bank stamped the check on March 22, and SCA's bank paid the check on March 23, thereby falling short of the statute of limitations by one and two days, respectively.

At trial, it was established that defendant worked for SCA, which was in the business of buying steel scrap, as a yard foreman from 1980 until March 30, 1983. At the same time, defendant owned two businesses, Bartco and U.S. Tank, which provided steel scrap to scrap companies. In 1981, Bartco began selling scrap to SCA. In 1982, U.S. Tank began selling scrap to SCA. During 1981, 1982 and 1983, SCA had paid out 91 checks to Bartco and U.S. Tank, for a total of $101,988.21.

The method of delivery of scrap and payment therefor was established at trial as the key to the alleged fraud. When a truckload of scrap entered the SCA yard, it was weighed at a scale by the scalemaster, whose work station overlooked the scale platform. An instrument printed the weight on a receiving ticket, which was time stamped by the scalemaster. The truck left the scale. The scrap on the truck was inspected by a yard inspector or foreman, who completed

an inspection ticket and had the truck unloaded. The empty truck was then reweighed. The scalemaster recorded the second weight, time stamped the ticket, and recorded the load's receipt in a purchase log. The yardmaster or his assistant made out a check for the delivery.

James Sargent, SCA's manager of trucking, testified for the State that on March 30, 1983, he arrived at work at 5 a.m. His second-floor office overlooked the truck scale. At 5:45 a.m., Sargent heard defendant arrive in his first-floor office. No one else was present. Patrick Tang, SCA's general manager, had instructed Sargent to watch to see if trucks weighed on the scale corresponded with receiving tickets. Sargent heard defendant go upstairs, and he then twice heard the scale operating. Sargent looked out the window facing the scale and saw nothing on it. There were no trucks in the yard. When Sargent returned to his office, he saw on the scalemaster's desk a receiving ticket for Bartco, which had not been present several minutes earlier.

Tang testified that in March 1983 SCA had hired a private investigation firm to survey the traffic coming into the yard. Tang personally went through the yard on various dates, including March 7, 11, 18, and 30, 1983, looking for Bartco loads after being notified of a Bartco entry in the scalemaster's record. He could find no Bartco loads in the yard. On March 30, Tang met with defendant, who stated that Bartco owned a red truck and a white truck. Defendant was terminated that day. During Tang's employment with SCA he never saw any Bartco or U.S. Tank trucks in the yard. The traffic control reports on several occasions showed no entry of Bartco trucks on days when the purchase logs showed that a Bartco delivery and payment had been made. With the exception of four inspection reports, the remaining 87 inspection reports on Bartco and U.S. Tank loads were prepared by defendant. Most of the receiving tickets were unusual because they had no time stamp or carrier designation on them, and after April 1982 they were not signed by the scalemaster. Also unusual was the fact that the purchase logs showed the Bartco and U.S. Tank loads were usually listed as either the first or last entries of the day. Defendant was authorized to weigh and inspect early deliveries if the scalemaster was not yet on duty.

Sheila Green, the scalemaster from 1980 to 1985, testified for the State. The digital weigher could be operated manually so that a weight could be entered without a truck being on the scale. Most of the relevant inspection reports and receiving tickets were completed by defendant. Most of the receiving tickets were time stamped to show the time of delivery and were all processed by defendant. She had never seen a Bartco or U.S. Tank delivery, or processed any

weighing information for their loads while she was scalemaster. She often found Bartco receiving tickets on her desk when she arrived in the morning. Trucks could bypass the guardhouse and go directly to the scale.

Defendant testified that materials from Bartco were delivered by independent truckers, including Lucien Ouelletter and Bobby Goss. As yard foreman, he filled out 30 or 40 inspection reports at the end of each day without viewing the loads. In 1982, he began dismantling a ship for which he sold the scrap to SCA. It was transported in SCA trailers in 20 or 30 different loads. He had five to seven men on the crew working for U.S. Tank, but could only remember one named "Amelio." He had no record of payments to Bartco drivers because they were paid in cash.

We initially consider defendant's contention that the three-year statute of limitations had run at the time he was indicted.

■■ ■ On March 21, 1986, defendant was indicted. The applicable statute requires that defendant be charged within three years. (Ill. Rev. Stat. 1985, ch. 38, par. 3—5.) A statute of limitations begins to run when the alleged offense is completed. (*Toussie v. United States* (1970), 397 U.S. 112, 115, 25 L. Ed. 2d 156, 161, 90 S. Ct. 858, 860.) The State bears the burden of proving that the offense occurred within the applicable statute of limitations. (*People v. Steinmann* (1978), 57 Ill. App. 3d 887, 373 N.E.2d 757.) The March 30, 1983, fraudulent receiving ticket allegedly completed by defendant obviously would not be covered under the indictment, and we reject the State's argument to the contrary. The other relevant dates showing the time the offense was completed establish that the statute of limitations had expired when the indictment was filed.

On March 16, 1983, the last nondelivery of scrap allegedly took place.

As the State apparently concedes, on March 18, 1983, SCA's check bearing that date was received by defendant personally, since the check showed no mailing address.

On March 22, 1983, defendant's bank stamped the check when defendant cashed it. On March 23, 1983, SCA's bank paid the check.

The indictment states that by deception defendant obtained control over property, specifically "checks or orders for the payment of money." The evidence establishes without question that the last time defendant obtained control over a "check or order for the payment of money" was on March 18, 1983. Moreover, the State's answer to defendant's bill of particulars was that the checks themselves were "the property herein involved."

■ The theft statute defines "property" as "commercial instruments." (Ill. Rev. Stat. 1985, ch. 38, par. 15—1.) The value of a commercial instrument is its "market value." (Ill. Rev. Stat. 1985, ch. 38, par. 15—9(a).) The check itself, therefore, and not the cash ultimately received for that check, satisfies the theft statute.

■ We find that the theft of the March 18 check was complete when defendant obtained control over it. He could not commit a second, separate theft of the same check when he cashed it. See *People v. Steinmann* (1978), 57 Ill. App. 3d 887, 373 N.E.2d 757.

Moreover, it would be absurd to require the State to delay an arrest until a defendant actually cashed a check which he had stolen by deception. The State had every right to arrest defendant on March 18, as soon as he had the check in hand. If, as the State argues, there could be insufficient funds in SCA's account to cover the check, or if SCA stopped payment on the check, the theft would still be complete. Under the State's logic, the theft would not be complete if defendant could not find a bank willing to cash a check made out to Bartco, or the check was accidentally destroyed after defendant obtained it, or a third party stole the check from defendant before he could cash it.

Although the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, we hold that the State failed to meet its burden of proving that the offense occurred within the applicable three-year statute of limitations. Thus, the conviction must be reversed.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

EGAN, P.J., and LaPORTA, J., concur.